IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| NEIL STOKES and CRAIG FELZIEN, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:14-cv-04338-NKL |
| DISH NETWORK L.L.C., a Colorado Limited liability corporation, | ) ) ) ) | |
| Defendant. | ) | |

**ORDER**

Before the Court is Defendant DISH Network's Motion to Dismiss Plaintiff Neil Stokes' claims arising out of an interruption of his satellite television service. [Doc. 16]. For the reasons set forth below, DISH's Motion to Dismiss is denied as to Counts I and II and granted with respect to Counts III through VI.

**I.  Background**

Defendant DISH Network is a Colorado corporation that markets and sells satellite television access packages nationwide. The programming packages DISH markets and sells include different combinations of channels depending on the package. Plaintiffs Neil Stokes, in 2008, and Craig Felzien, in 2000, (collectively Plaintiffs) ordered and selected one of DISH's programming packages. Immediately after installing the satellite equipment in Plaintiffs' homes, a DISH representative presented them with a Subscription Agreement. The Subscription Agreement is comprised of the Digital Home Advantage Plan Agreement (Plan Agreement) and the Residential Customer Agreement (RCA).

The Plan Agreement, which Plaintiffs signed, contains the following relevant provisions:

1

> This agreement (the "Agreement") sets forth the terms and conditions of the Digital Home Advantage promotion. Additional terms and conditions of service are contained in the Residential Customer Agreement provided to you in your receiver User's Guide and made available at www.dishnetwork.com.
>
> BY SIGNING BELOW YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE RECEIVED, READ, UNDERSTAND, AND AGREE TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, THE TERMS AND CONDITIONS SET FORTH ON ITS SECOND PAGE, AND THE RESIDENTIAL CUSTOMER AGREEMENT, WHICH IS INCORPORATED HEREIN BY REFERENCE, AND THAT THE FOLLOWING TERMS WERE DISCLOSED TO YOU PRIOR TO LEASE:
> . . .
> **WE RESERVE THE RIGHT TO CHANGE PRICES, PACKAGES, AND PROGRAMMING AT ANY TIME, INCLUDING WITHOUT LIMITATION, DURING ANY TERM AGREEMENT PERIOD TO WHICH YOU HAVE AGREED.**
> . . .

[Doc. 4-1].

Plaintiffs also received the RCA after installation of the satellite equipment. The RCA, which was located in the back of a 156-page Satellite Receiver User's Guide, contains the following relevant provisions:

> 1. THE DISH NETWORK SERVICE
>
> . . .
> I. <u>Changes in Services Offered</u>. We may add, delete, rearrange and/or change any and all programming . . . including without limitation, during any term commitment period to which you have agreed. . . . In the event that we delete, rearrange or change any programming . . . we have no obligation to replace or supplement such programming . . . . You are not entitled to any refund because of a deletion, rearrangement or change of any programming . . . .

[Doc. 4-3, p. 3].

> 3. CANCELLATION OF SERVICE

2

> . . .
> D. <u>No Credits</u>. If your Services are cancelled or disconnected for any reason, you still must pay all outstanding balances accrued . . . . Except in certain limited circumstances, charges for Services, once charged to your account, are non-refundable, and no refunds or credits will be provided in connection with the cancellation of Services. . . .

[Doc. 4-3, p. 5].

> 7. LIMITATION OF OUR LIABILITY
> A. <u>INTERRUPTIONS AND DELAYS</u>. NEITHER WE NOR OUR THIRD-PARTY BILLING AGENTS . . . WILL BE LIABLE FOR ANY INTERRUPTION IN ANY SERVICE OR FOR ANY DELAY OR FAILURE TO PERFORM, INCLUDING WITHOUT LIMITATION: IF SUCH INTERRUPTION, DELAY OR FAILURE TO PERFORM ARISES IN CONNECTION WITH THE TERMINATION OR SUSPENSION OF DISH NETWORK'S ACCESS TO ALL OR ANY PORTION OF SERVICES; THE RELOCATION OF ALL OR ANY PORTION OF THE SERVICES TO DIFFERENT SATELLITE(S); A CHANGE IN THE FEATURES AVAILABLE WITH YOUR EQUIPMENT; ANY SOFTWARE OR OTHER DOWNLOADS INITIATED BY US; OR ANY ACTS OF GOD, FIRES, EARTHQUAKES, FLOODS . . . OR ANY OTHER CAUSE BEYOND OUR CONTROL.
> . . .
> F. <u>DAMAGES LIMITATION</u>. NEITHER WE NOR OUR THIRD-PARTY BILLING AGENTS . . . SHALL HAVE ANY LIABILITY WHATSOEVER FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO: . . . OUR FURNISHING OR FAILURE TO FURNISH ANY SERVICES . . . TO YOU; OR ANY FAULT, FAILURE, DEFICIENCY OR DEFECT IN SERVICES . . . FURNISHED TO YOU.

[Doc. 4-3, pp. 7-8].

The programming package selected and paid for by Stokes was the "America's Top 120," which included channels such as CNN, Headline News, CNN en Espanol, the Cartoon Network/Adult Swim, Turner Classic Movies, truTV, Boomerang, and The Hub (collectively, Turner Programming) and FOX News Channel and FOX Business Network (collectively, FOX

3

News Programming).  Felzien selected "America's Top 250," which also included Turner and FOX News Programming.  DISH did not provide Turner Programming from October 21, 2014, to November 20, 2014.  DISH has not provided FOX News Programming since December 21, 2014, but continues to advertise and sell programming packages that purport to include FOX News Programming.  DISH refused to provide Plaintiffs a full credit and/or reduction in DISH's monthly fees or any other monetary relief for the lost programming and refused to permit subscribers with packages containing this programming to terminate their contract with DISH without a termination fee.  Plaintiffs now seek compensation, declaratory judgment, and injunctive relief arising out of the following claims: (I) breach of contract; (II) breach of the covenant of good faith and fair dealing; (III) unjust enrichment; (IV) Colorado Consumer Protection Act; (V) Missouri Merchandising Practices Act; and (VI) declaratory judgment.

## II.   Discussion

### A.  Counts I-II: Breaches of Contract and the Covenant of Good Faith and Fair Dealing

Plaintiffs allege DISH breached its contract with them by agreeing to provide Turner and FOX News Programming to them in exchange for a payment, collecting that payment from them, and failing to provide the programming.  [Doc. 4, ¶¶ 63-63].  Plaintiffs further allege DISH breached the covenant of good faith and fair dealing by collecting money from them for programming that it did not provide and refusing to provide Plaintiffs a credit for that failure.  *Id.* at ¶¶ 67-68.

At the outset of this discussion, the Court notes that it has previously interpreted the same Subscription Agreement (comprised of the Plan Agreement and the RCA) under very similar facts and arguments in *Padberg v. DISH Network, LLC*, 2012 WL 2120765 (W.D. Mo. 2012), and denied a similar Motion to Dismiss filed by DISH.  Accordingly, the Court will first discuss

its decision in *Padberg* and then address any new arguments presented by DISH in this case. In *Padberg*, the plaintiff alleged, among other claims, breach of contract and breach of the covenant of good faith and fair dealing arising out of DISH's failure to provide FX and regional sports channels from October 1, 2010, to October 29, 2010, and its refusal to compensate subscribers who paid for those channels but did not receive access to them. *Id.* at *1-2. Like in this case, DISH filed a Motion to Dismiss and argued that the express terms of the Subscription Agreement – which were identical to the terms in this case – contradicted the plaintiff's breach of contract and good faith and fair dealing claims. DISH argued that the express terms of the Subscription Agreement permitted DISH to change prices, packages and programming at any time and to add, delete, rearrange and/or change any and all programming without providing supplemental programming or a refund to subscribers. *Id.* at *3. The plaintiff argued that if the Court interpreted the Subscription Agreement to give DISH discretion to change his programming at any time, then his agreement with DISH was illusory, and therefore unenforceable, because the agreement entitled DISH to collect monthly payments from him regardless of whether DISH supplied him with any satellite programming and allowed DISH to do so without providing any recompense to him. *Id.*

This Court concluded that the agreement was not illusory because although the Subscription Agreement granted DISH the discretion to change the plaintiff's programming at any time, under Colorado law,[1] the Subscription Agreement contained an implied duty of good faith and fair dealing. *Id.* Pursuant to that implied duty, DISH's discretion to add, delete or change programming must be exercised reasonably. *Id.* This Court further concluded that the implied duty of good faith and fair dealing did not contradict the express terms of the

---

[1] Like in *Padberg*, Colorado law applies in this case as well. The Subscription Agreement, which is enforceable, provides that Colorado law governs, and neither Party appears to contest this conclusion.

5

Subscription Agreement because although a provision in the Subscription Agreement prohibited refunds (RCA, § 1.I, [Doc. 4-3, p. 3]), that provision did not mean a credit going forward for lost programming or a future change in price reflecting the lost services was not within the reasonable expectations of the parties. *Id.* at *4.

DISH also argued that Section 7 of the RCA precluded the plaintiff from pursuing a claim for the breach of a duty of good faith and fair dealing. Again, Section 7.A provides:

> 7. LIMITATION OF OUR LIABILITY
> A. <u>INTERRUPTIONS AND DELAYS</u>. NEITHER WE NOR OUR THIRD-PARTY BILLING AGENTS . . . WILL BE LIABLE FOR ANY INTERRUPTION IN ANY SERVICE OR FOR ANY DELAY OR FAILURE TO PERFORM, INCLUDING WITHOUT LIMITATION: IF SUCH INTERRUPTION, DELAY OR FAILURE TO PERFORM ARISES IN CONNECTION WITH THE TERMINATION OR SUSPENSION OF DISH NETWORK'S ACCESS TO ALL OR ANY PORTION OF SERVICES; THE RELOCATION OF ALL OR ANY PORTION OF THE SERVICES TO DIFFERENT SATELLITE(S); A CHANGE IN THE FEATURES AVAILABLE WITH YOUR EQUIPMENT; ANY SOFTWARE OR OTHER DOWNLOADS INITIATED BY US; OR ANY ACTS OF GOD, FIRES, EARTHQUAKES, FLOODS . . . OR ANY OTHER CAUSE BEYOND OUR CONTROL.

The Court stated that while at first blush Section 7.A seems to say that DISH cannot be held liable for any interruption or delay of any or all programs for any period of time or for a failure to perform, "[s]uch an interpretation would of course render the contract illusory." *Id.* However, the Court looked at Section 7.A in context with the entire contract and concluded that two additional parts of the contract demonstrated that the parties did not intend DISH to have the "extreme and unexpected breadth of discretion" suggested by the first clause in Section 7.A limiting liability for interruptions, delays and failure to perform. *Id.* The Court stated:

> Of primary importance is the last phrase in that same sentence. It says: "*or any other cause beyond our reasonable control.*" [Exhibit 4 at 8]. This suggests that Dish Network's liability is

6

> limited only when the circumstances are beyond Dish Network's control, a concept completely consistent with the duty of the good faith and fair dealing and most likely to reflect the intentions of the parties at the time the agreement was formed. Further, it is an interpretation that prevents the contract from being illusory. Second, the last paragraph of Section 7 of the Residential Customer Agreement limits damages "for furnishing or failing to furnish any service". It provides that there will be "no special, indirect, incidental or consequential damages" for failing to furnish services. If Dish Network had no liability for "failure to perform" or for interruptions of services over which it had control, there would be no need to talk about how damages will be limited when services are not provided. Therefore, it is logical to interpret the Residential Customer Agreement to mean that Dish Network's liability was limited when an interruption in service or a failure to perform was caused by events beyond the control of Dish Network.

*Id.* The Court concluded that it could not say the plaintiff's breach of contract and good faith and fair dealing claims were implausible, "because the operative question is whether it was reasonable for Dish Network to stop providing the Fox channel, keep the payments it would have been paying previously for the channel and provide no recompense to its customers." *Id.* at *5.

In DISH's present Motion to Dismiss, DISH repeats many of the arguments it made previously in *Padberg*. *Compare Padberg v. DISH Network, LLC*, 2:11-cv-04035-NKL, [Docs. 19, 35], *with Stokes v. DISH Network, LLC*, 2:14-cv-04338-NKL, [Docs. 17, 23]. For the purpose of efficiency, the Court will not repeat its reasoning for why those arguments – applied to the same contract as in *Padberg* – are equally unavailing here. Nonetheless, DISH argues that this Court cannot simply re-issue the *Padberg* opinion in this case because DISH has raised or emphasized important arguments for the first time in this case.

DISH does not point out which arguments in this case are "new" or "emphasized." However, upon review of DISH's arguments in *Padberg* and in this case, a few arguments appear to be new to this case.

7

First, DISH argues that Section 7.A limits DISH's liability regardless of whether an interruption in service, delay, or failure to perform was within or beyond, DISH's reasonable control. In support of this argument, DISH argues that Section 7.A is written in the disjunctive (it uses "or") and that the phrase "or any other cause beyond our reasonable control" applies only to the last scenario in the paragraph (acts of god, fires, earthquakes, floods, etc.). However, this Court's previous interpretation of Section 7.A. in *Padberg* involved the same clause written in the same manner, including the disjunctive form and the existence of semi-colons. *Compare Compare Padberg v. DISH Network, LLC*, 2:11-cv-04035-NKL, [Docs. 1-4, 106], *with Stokes v. DISH Network, LLC*, 2:14-cv-04338-NKL, [Doc. 1-3]. Interpreting Section 7.A to absolve DISH of liability for interruptions in any service for a delay or for a failure to perform regardless of whether the loss was within its control would render the contract illusory. *See Padberg*, 2012 WL 2120765 at *4. Further, as this Court has previously reasoned, if Section 7.A absolved DISH of all liability, there would be no need for Section 7.F which limits the types of damages available to a subscriber arising out of DISH's failure to furnish services or DISH's fault, failure, deficiency or defect in services.

Next, DISH argues that interpreting 7.A to apply to circumstances both within and beyond DISH's reasonable control does not render Section 7.F meaningless. Instead, DISH suggests that Section 7.A – titled "Interruptions and Delays" – is intended to apply only to temporary or partial interruptions in service and that "its plain terms . . . set forth discrete and temporally-limited examples of such interruptions and delay." [Doc. 23, p. 10]. DISH contends Section 7.A "disclaims DISH's liability for short-term interruptions or delays, not a *wholesale* failure to perform." *Id.* at 11 (emphasis in original). It follows, DISH argues, that "[w]hile Section 7.A disclaims *all* liability for *temporary* interruptions or delays, Section 7.F limits DISH's liability to

8

only direct damages under *any scenario*, even if DISH utterly fails to provide *any services whatsoever.*" *Id.* (emphasis in original). Therefore, DISH reasons, Sections 7.A and 7.F may be harmonized without interpreting Section 7.A to absolve DISH's liability for only those instances where interruptions in service, delay, and a failure to perform were beyond its reasonable control.

This argument fails for two reasons. First, DISH has previously argued that the "failure to perform" language in Section 7.A. only relates to interruptions and delay and not a separate failure to perform. *See Padberg v. DISH Network, LLC*, 2:11-cv-04035-NKL, [Doc. 74, pp. 12-14]. This Court rejected that argument, concluding that Section 7.A precludes liability for a failure to perform, "separate and distinct from interruptions and delays" (when the failure is within DISH's reasonable control). *Padberg*, 2012 WL 2120765 at *4 (citing *Chandler-McPhail v. Duffey*, 194 P.3d 434, 437 (Colo. App. 2007) ("[C]ourts should seek to give effect to all provisions so that none will be rendered meaningless.")). Second, DISH's interpretation that Section 7.A applies to "temporary" or "short-term" interruptions and delays is not supported by the plain language of Section 7.A. Nowhere in Section 7.A are the words "temporary" or "short-term" used. To the contrary, Section 7.A states, in part, that DISH will not be liable for a "failure to perform, including without limitation: . . . if such failure to perform arises in connection with the *termination or suspension* of DISH Network's access to all or any portion of services." (emphasis added). Section 7.A differentiates between termination and suspension of services, which suggests the Parties contemplated both DISH's permanent (termination) and short-term (suspension) loss of access to programming. Further, the examples are not all "temporally-limited" as DISH suggests. For example, a change in the features available with a subscriber's equipment or a software download initiated by DISH could permanently alter

9

certain Services (defined as "video, audio, data, interactive and other programming services . . ."
[Doc. 4-3, Section 1.A]) provided. For these reasons, DISH's alternative interpretation of
Sections 7.A and 7.F is unpersuasive, and the Court will not interpret those provisions in a
different manner than it did in *Padberg* based on those arguments.

Next, DISH argues that "Plaintiffs want to supplement the Subscri[ption] Agreement by
adding an entitlement to a 'credit' in the event of a temporary service interruption" but that 'the
contract says nothing at all about Plaintiffs' entitlement to a 'credit.'" [Doc. 23, p. 12]. DISH
also contends that the contract expressly prohibits a "refund" and that the "credit" Plaintiffs seek
"is a refund in everything but name." [Doc. 17, p. 18]. However, as this Court previously
pointed out in *Padberg*, the section of the RCA that addresses cancellation of services (Section
3.D) specifically prohibits both "credits" and "refunds" while the section dealing with changes in
programming (Section 1.I) only prohibits "refunds." *Padberg*, 2012 WL 2120765 at *4. This
suggests that other remedies, such as a credit, are available when DISH exercises its discretion to
change or delete programming in an unreasonable way. *Id.* Further, DISH, as the author of the
RCA, is the Party who differentiated between a credit and refund in its form contract and cannot
now argue that the distinction is meaningless. *See Chandler-McPhail v. Duffey*, 194 P.3d at 437.

DISH also cites to *McClamrock v. DISH Network*, LLC, 2011 WL 7430006 (N.D. Ga.
2011), in support of its Motion to Dismiss. However, DISH previously cited to *McClamrock* in
*Padberg*, and the Court finds it no more convincing now than it did then. *See Padberg v. DISH
Network, LLC*, 2:11-cv-04035-NKL, [Docs. 64, 74, p. 12]. However, because the Court did not
expressly address *McClamrock* in its Order denying DISH's Motion to Dismiss in *Padberg*, the
Court will do so now. In *McClamrock*, the plaintiff filed suit against DISH alleging breach of
contract arising out of DISH's failure to provide access to FOX Sports South programming for a

10

28-day period in October 2010. *McClamrock*, 2011 WL 7430006 at *1. The terms of the Subscription Agreement in that case were nearly identical to the terms at issue in this case. DISH argued that under the terms of the RCA, it was entitled to summary judgment because the RCA permitted DISH to "add, delete, rearrange and/or change any and all programming" without providing a refund to customers. *Id.* at *3. The plaintiff argued that despite the terms in the RCA, DISH was not entitled to summary judgment because the court should consider the course of dealing between the parties, because the terms in the RCA were inconsistent with another agreement signed by the plaintiff, and because the RCA was unconscionable and therefore, unenforceable. *Id.* The district court concluded that the course of dealing between the parties should not be considered because it directly contradicted and negated a portion of the RCA. *Id.* at *6. The district court further concluded that the RCA did not conflict with another limited liability provision signed by the plaintiff, and that even if there was a conflict, the plaintiff failed to explain how DISH's limited liability for occurrences beyond its control affirmatively imposed liability for its failure to provide programming for 28 days, even if this failure was within DISH's control. *Id.* The court also reasoned that even if the failure to provide programming was within DISH's reasonable control, other portions of the 2009 RCA still immunized DISH from liability, particularly, the provision allowing DISH to "add, delete, rearrange and/or change programming" without supplementing the programming or providing a refund. *Id.* at *6-7. The district court also concluded that the RCA was not unconscionable.

Aside from respectfully disagreeing with the Georgia district court's interpretation of the Subscription Agreement, the Court finds this case distinguishable from *McClamrock* in at least two important ways. First, in *McClamrock*, the plaintiff conceded that "the RCA contains an <u>un</u>limited disclaimer which otherwise would absolve DISH of all failures to deliver, including

11

those failures it controls" but argued the RCA's terms were superseded by terms in another form signed by the plaintiff.  *See* Pl.'s Sugg. in Opp. to Mtn. to Dismiss in *McClamrock v. DISH Network LLC*, 10-cv-03593-CAP (N.D. Ga.) [Doc. 20, p. 10] (emphasis in original).  However, in this case, Plaintiffs do not concede that the RCA provides an unlimited disclaimer of liability.  Rather, Plaintiffs allege and argue, and the Court agrees, that although the RCA grants DISH the discretion to change programming at any time, under Colorado law, that discretion is subject to an implied duty of good faith and fair dealing.  There is no discussion in *McClamrock* about the duty of good faith and fair dealing.  In fact, Plaintiffs in this case separately allege breach of the implied covenant of good faith and fair dealing while in *McClamrock* the only claim was breach of contract. Plaintiffs also argue that Section 7.A of the RCA is not an unlimited disclaimer and that it must be read in conjunction with Section 7.F.  As discussed above, the Court agrees.  Second, the plaintiff in *McClamrock* alleged DISH breached its contract by failing or refusing to deliver programming but alleged no facts to support how they failed or refused to deliver programming.  Amended Compl., *McClamrock v. DISH Network LLC*, 10-cv-03593-CAP (N.D. Ga.) [Doc. 4, ¶¶ 21-24].  In this case, Plaintiffs allege that DISH knew and understood its carriage agreements with Turner Broadcasting System and FOX would expire but chose not to renew the agreements. [Doc. 4, ¶¶ 40-41, 44-45].  For these reasons, the Court does not find the Georgia district court's interpretation of the Subscription Agreement controlling.

Finally, in its written briefs in support of dismissal, DISH argues the Subscription Agreement cannot be illusory because DISH performed – at least in part – under the Subscription Agreement by providing hundreds of channels to Plaintiffs during the interruption.  DISH argues that its contract performance defeats any claim that the contract is illusory under the facts

12

alleged. [Doc. 17, p. 21]. In support of this argument, DISH cites to *O'Hara Group Denver, LTD. V. Marcor Housing Sys., Inc.*, 595 P.2d 679 (Colo. 1979).

In *O'Hara*, a buyer entered into two contracts for the purchase of commercial properties. *O'Hara*, 595 P.2d at 681. As part of the agreements, the buyer placed money in an escrow account to serve as liquidated damages in the event it did not honor its obligations under the contract. When the buyer did not show up for the closing, the seller immediately made demand for the liquidated damages placed in escrow. *Id.* at 682. The buyer argued the seller was not entitled to liquidated damages because, among other reasons, the contracts at issue were illusory for lack of sufficient consideration and therefore, unenforceable. *Id.* at 683. The buyer pointed to the terms of the agreements which stated that if the seller failed or refused to perform, the agreements would be null and void with neither party having any further obligations thereunder. *Id.* The buyer argued this clause deprived the buyer of any legal remedy and therefore "render[ed] [the seller's] promise to perform illusory and, hence, insufficient consideration to support a contract." *Id.* at 684. The Colorado trial court held that the seller's right to refuse to perform its obligations under the agreements to purchase was limited by an implicit requirement that it act in "good faith," thereby creating sufficient consideration. *Id.* On appeal, the Supreme Court of Colorado stated that it "need not decide whether such a requirement limited [the seller's] freedom of action" because "certain actions taken by [the seller] pursuant to the contracts provided sufficient consideration to validate those agreements." *Id.* Specifically, the seller withheld the commercial properties from the market for eleven months, granted the buyer two extensions to the closing date, and allowed the buyer to enter on the properties in order to conduct engineering studies. *Id.* The Supreme Court of Colorado reasoned that "[b]y these

13

actions, [the seller] incurred a sufficient detriment to provide consideration for the contracts to purchase." *Id.*

*O'Hara* stands for the principle that a contract is not illusory for lack of consideration once the party with the purportedly unlimited right to refuse performance has at least partially performed. In other words, the Supreme Court of Colorado concluded that the seller's actions provided sufficient consideration to create binding contracts and therefore, pursuant to those contracts, the seller was entitled to the liquidated damages held in escrow. During oral argument, however, DISH attempted to expand the scope of *O'Hara* when it asserted that according to *O'Hara*, once there is no concern regarding whether a contract is illusory, a court need not conduct a good faith and fair dealing analysis. *See* [Doc. 32, p. 10].[2] But *O'Hara* stands for no such thing. The *O'Hara* court did not conclude that the doctrine of good faith and fair dealing did not apply to the contract or should not be considered. Rather, for the sole purpose of determining whether sufficient consideration existed to create an enforceable contract, the Supreme Court of Colorado determined that it "need not decide whether [the doctrine of good faith and fair dealing] limited [the seller's] freedom of action that consideration for its promise was present" because the seller's actions were sufficient evidence of "detriment." *Id.* at 684. Once the Supreme Court of Colorado determined the contract was enforceable, it did not go on to interpret the contract or the scope of the seller's right to refuse to perform under that contract because there was no further allegation that the seller breached the contract by refusing

---

[2] DISH's counsel stated,
> The point of the *O'Hara* case is that in that case the real estate contract allows the seller to refuse to perform and the trial court said, That sounds illusory to me so I'm going to impose the duty of good faith on the exercise of that refusal. The Colorado Supreme Court says, No, no, because there was partial performance under the contract, you cannot be concerned about illusory and therefore you do not need to impose good faith because the seller's actions under it provided sufficient consideration. You stop there. When you don't have illusory, you stop. You don't have to go to the discretionary paragraph.

14

to perform.  Instead, the buyer argued no contract existed in an attempt to avoid paying liquidated damages required by that contract.  But in this case, even if the Subscription Agreement is not illusory for lack of sufficient consideration because DISH provided hundreds of channels during the black out, Plaintiffs are still alleging that DISH breached its contract with them by taking money for programming it did not provide and then refusing to credit them for that loss.  DISH disputes that it owed a credit at all because according to its interpretation of the Subscription Agreement, it has total discretion to change or delete programming without providing recompense to the Plaintiffs.  The Court agrees that DISH has discretion to change or delete programming under the terms of the Subscription Agreement, but that discretion is limited by the doctrine of good faith and fair dealing.

As in *Padberg*, this Court cannot say that Plaintiffs' Counts I and II are implausible. The operative question is whether it was reasonable for DISH to stop providing Turner and FOX News Programming, keep the payments it would have been paying previously to the providers for those channels, and provide no recompense to its customers.  Such a fact question cannot be resolved by a motion to dismiss and is a question for the jury.

## B. Non-Contract Claims

### 1. Unjust Enrichment

In the event the Court finds the Subscription Agreement unenforceable because it is illusory, lacking in mutuality, or unconscionable, Plaintiffs seek alternative relief through an unjust enrichment claim.  Plaintiffs allege DISH was unjustly enriched by collecting and retaining fees from Plaintiffs for Turner and FOX News Programming in months where Plaintiffs did not have access to Turner and FOX News Programming.  "In general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same

15

subject matter because the express contract precludes any implied-in-law contract." *Interbank Invs. v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003). As discussed above, DISH's conduct is expressly covered by a valid agreement between the parties (the Subscription Agreement), and therefore, Plaintiffs cannot recover for unjust enrichment. Count III is dismissed.

### 2. Count IV: Colorado Consumer Protection Act

In Count IV, Plaintiffs seek relief pursuant to the Colorado Consumer Protection Act (CCPA) "[i]n the event the Court determines the Subscription Agreement is unenforceable . . . ." [Doc. 19, p. 23]. Plaintiffs' CCPA claim is two-pronged. First, Plaintiffs allege DISH violated various sections of the CCPA when, in late 2014, it advertised that Turner and FOX News Programming were included in various packages even though DISH knew the programming was not available to DISH subscribers. *See* First Amend. Compl., [Doc. 4, ¶¶ 78-80]. Second, Plaintiffs allege DISH failed to disclose in advertisements its right to change or delete programming without a credit or monetary recompense, failed to disclose the relevant dates of its license agreements with Turner Broadcasting and FOX, charged customers for programming they did not receive, employed "bait and switch advertising," and refused to allow customers to cancel their contracts without a termination fee after Turner and FOX News Programming were no longer available. *Id.* at ¶¶ 81-92.

To state a claim under the CCPA, a plaintiff must allege:

> (1) that the defendant engaged in an unfair or deceptive trade practice;
> (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation;
> (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;
> (4) that the plaintiff suffered injury in fact to a legally protected interest; and
> (5) that the challenged practice caused the plaintiff's injury.

*Rhino Linings USA, Inc. v. Rocky Mount. Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003). To establish a "deceptive trade practice," Plaintiffs must allege that DISH "knowingly [made] a false representation" and that "false representation must either induce a party to act, refrain from acting, or have the capacity to attract consumers."

Plaintiffs' claim that in 2014 DISH continued to advertise Turner and FOX News Programming despite the fact that DISH knew subscribers could no longer access this programming meets Colorado's definition of a "deceptive trade practice." Advertising that a satellite television package has certain programming – when it does not – is a false representation that has "the capacity or tendency to attract customers." *Id.* at 147. But while Plaintiffs have sufficiently alleged an "unfair or deceptive trade practice," Plaintiffs have not alleged that this conduct, which occurred in 2014 and continues presently, injured them. Plaintiffs did not allege that at the time they purchased their DISH service – or even renewed their contracts with DISH – that DISH advertised Turner and FOX News Programming knowing that it was not available and that they were thereby damaged as a result of this misrepresentation. To the contrary, Plaintiffs allege in their Amended Complaint that they entered into contracts with DISH in 2000 (Felzien) and 2008 (Stokes) but allege that Turner and FOX News Programming did not become unavailable until late 2014. Plaintiffs also failed to allege causation. Even if Plaintiffs were injured by paying for programming they did not receive, Plaintiffs have not alleged that DISH's misrepresentation related to the availability of this programming in its advertisements caused that injury. Plaintiffs had contracts with DISH and were obligated to pay for the programming packages they selected long before DISH advertised programs to which it knew subscribers would not have access.

17

As to Plaintiffs' claims that DISH omitted material facts in their advertisements, charged customers for programming they did not receive, and refused to allow Plaintiffs to terminate their contracts without a termination fee, Plaintiffs concede that this Court has previously determined that similar fraud claims against DISH failed because the alleged deception in DISH's advertising was remedied by the Subscription Agreement. Plaintiffs state that their CCPA claim is a form of alternative relief in the event the Court determines the Subscription Agreement is unenforceable. *See* [Doc. 19, p. 22]; *see also Padberg v. DISH Network, LLC*, 2012 WL 2120765 at *5 (W.D. Mo. 2012). However, as discussed above, the Court finds the Subscription Agreement to be enforceable, and therefore, even if DISH engaged in deceptive advertising, that deception was remedied by the express terms of the contract read and signed by Plaintiffs before Plaintiffs incurred any of the damages alleged in the Amended Complaint.

Plaintiffs' CCPA claims arising from misrepresentations in programming availability fail for lack of injury and causation, and Plaintiffs' CCPA claims arising from statements and omissions in DISH's advertising fail for lack of causation. Therefore, Count IV is dismissed.

**3. Count V: Missouri Merchandising Practices Act**

Plaintiffs allege that the conduct alleged to violate the CCPA also violates the Missouri Merchandising Practices Act (MMPA). To state a claim under the MMPA, Plaintiffs must allege they (1) purchased or leased merchandise (2) primarily for personal, family or household purposes (3) suffered an ascertainable loss of money or property, real or personal, (4) as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020 of the Missouri Revised Statutes. *See* Mo. Rev. Stat. § 407.025.

Plaintiffs' MMPA claims fail for the same reasons as do their CCPA claims. With respect to Plaintiffs' claims that DISH advertised programming it knew subscribers would not

18

have access to, Plaintiffs do not allege this conduct caused them to suffer "an ascertainable loss of money or property." Plaintiffs had contracts with DISH and were obligated to pay for the programming packages they selected long before DISH advertised programs to which it knew subscribers would not have access.

As to Plaintiffs' claims arising from statements and omissions in DISH's advertising, like Plaintiffs' CCPA claim, Plaintiffs concede that this Court has previously determined that similar fraud claims against DISH under the MMPA failed because the alleged deception in DISH's advertising was remedied by the Subscription Agreement. Plaintiffs state that their MMPA claim is a form of alternative relief in the event the Court determines the Subscription Agreement is unenforceable. *See* [Doc. 19, p. 22]; *see also Padberg*, 2012 WL 2120765 at *6. However, the Subscription Agreement is enforceable, so even if DISH engaged in deceptive advertising, that deception was remedied by the intervening factor of Plaintiffs reading and signing the contract. In other words, Plaintiffs cannot show an ascertainable loss "resulting from" DISH's actions.

Plaintiffs' MMPA claims arising from misrepresentations in programming availability fail for lack of injury and causation, and Plaintiffs' MMPA claims arising from statements and omissions in DISH's advertising fail for lack of causation. Therefore, Count V is dismissed.

### 4. Count VI: Declaratory Judgment

Plaintiffs also ask in the alternative to their breach of contract and breach of the covenant of good faith and fair dealing claims that the Court declare the Parties' rights on four aspects of the Subscription Agreement. "[A]ny court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. "A district court may exercise its discretion and determine that a declaratory judgment serves no useful purpose." *Cincinnati Indem. Co. v. A & K Const. Co.*, 542 F.3d 623, 625 (8th Cir. 2008);

*see also In re Orion Pics. Corp.*, 4 F.3d 1095, 1100 (2d Cir. 1993) (explaining that a district court may reject claims for declaratory judgment on issues also presented in a direct action). Because the Court concludes that Plaintiffs' request for declaratory judgment serves no identified purpose separate from Plaintiffs' enforcement of a contract claim, the Court declines to exercise jurisdiction to make the declarations sought by Plaintiffs. Count VI is dismissed.[3]

### III. Conclusion

For the reasons set forth above, DISH's Motion to Dismiss is DISH's Motion to Dismiss is denied as to Counts I and II and granted with respect to Counts III through VI.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: June 30, 2015
Jefferson City, Missouri

---

[3] In a section titled "Relief Requested" at the end of the Amended Complaint, Plaintiffs request that the Court enjoin DISH from (1) collecting monthly fees for programming which they paid for but which DISH did not provide; (2) collecting cancellation fees from Plaintiffs; and (3) continuing to advertise and market programming packages as containing FOX Channels, or any other channel DISH stops providing to subscribers. [Doc. 4, p. 24]. However, there is no separate claim in Plaintiffs' Amended Complaint laying out the reasons why an injunction would be appropriate. Further, neither DISH nor Plaintiffs mention these requests in any portion of the briefing on the Motion to Dismiss. Therefore, the Court will decline to address those requests at this time.